**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **In re**<br><br>**PETER M. TUFTS,**<br><br>                              **Debtor** | **Chapter 7**<br>**Case No. 09-18809** |

**MEMORANDUM OF DECISION ON OBJECTIONS OF PETER M. TUFTS TO**
**CLAIMS OF HILLSIDE AUTO REPAIR, INC. AND INSITE CONTRACTING, INC.**

The matters before the Court are the objections of chapter 7 debtor Peter M. Tufts ("the

Debtor") to proofs of claim filed by Hillside Auto Repair, Inc. ("Hillside") and InSite Contracting, Inc.

("InSite").  After an evidentiary hearing, I now make and enter the findings of fact and conclusions of

law required by Fed. R. Bankr. P. 7052, made applicable to this contested matter by Fed. R. Bankr. P.

9014(c).

**PROCEDURAL HISTORY**

The Debtor filed a voluntary chapter 7 petition on September 16, 2009.  In short order, the

the chapter 7 trustee filed a report of no distribution, the Debtor received a discharge, and, on

January 5, 2010, the case was closed.  On August 7, 2020, the United States Trustee filed a motion to

reopen the case and reappoint the chapter 7 trustee to administer a newly-discovered asset, a

postpetition recovery by the Debtor with prepetition roots that had not been disclosed. The Court

reopened the case on August 12, 2020 and established a deadline for the filing of proofs of claim.

Hillside filed a proof of claim (Claim No. 3) asserting an unsecured claim in the amount of $47,966.26

for goods sold, services performed, and certain loans. InSite Contracting, Inc. ("InSite") filed a proof

of claim (Claim No. 4) asserting an unsecured claim in the amount of $147,554.22 for loans to the

Debtor.  Hillside and InSite have the same principal, one Frank Spinosa.  The Debtor filed an

objection to each of these claims.  Those objections are the subject of this memorandum. In

accordance with the Court's pretrial order, direct testimony was submitted by affidavit.  After a

three-day combined evidentiary hearing on the two objections to claims, the parties submitted

proposed findings of fact and conclusions of law, whereupon the Court took these matters under

advisement.

**JURISDICTION AND AUTHORITY**

Subject to exceptions not applicable here, the bankruptcy jurisdiction of the district courts

extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11."

28 U.S.C. § 1334(b). An objection to claim arises not only in a bankruptcy case but under title 11, see

11 U.S.C. § 502(b) (authorizing court to adjudicate objections to claims), and it concerns and relates

to the distribution of the assets of the estate. It therefore falls squarely in the bankruptcy jurisdiction

conferred on the district courts by § 1334(b) and, pursuant to 28 U.S.C. § 157(a), referred by the

district court for this district to the bankruptcy court for this district by a standing order of reference.

Moreover, objections to claims are core proceedings within the meaning of § 157(b)(1) and (2). See

28 U.S.C. § 157(b)(2)(B) (core proceedings include allowance or disallowance of claims against the

estate). Accordingly, the Court may hear and finally determine them. 28 U.S.C. § 157(b)(1).

**FINDINGS OF FACT**

1. Frank Spinosa ("Spinosa") is the president of Hillside and also of InSite.

2. Until 2013, Spinosa and the Debtor were close friends for many years.

3. In 2001, the Debtor formed Tufts Transportation, Inc. ("Transportation"), a company that
   provided snow removal, trucking, hauling, and excavation services.

4. Transportation was a significant customer of Hillside, often purchasing fuel there and relying
   on Hillside to service Transportation's fleet of trucks, equipment, and other vehicles.

5. After losing a major customer, Transportation experienced financial distress and stopped
   operating in late 2007.

**Hillside Proof of Claim (Claim No. 3)**

6.   Hillside operated a service and filling station in Somerville, Massachusetts.

7.   Hillside's proof of claim asserts an unsecured debt in the amount of $47,966.26 for sales of

gasoline, vehicle servicing and repairs, and loans.  Attached to the proof of claim is a four-

page statement of account (the "Hillside Statement"). The Hillside Statement includes many

more items than total $47,966.26, shows many payments, and does not ever state an

account balance as of any point in time, much less keep a running balance. The proof of

claim does not identify the specific items on the Hillside Statement that comprise the

$47,966.26 amount of the claim. Assuming that payments made were applied first to the

oldest charges, I conclude that the items that comprise the claim amount are the newest

charges, the following thirty items:

| Date | Description | Amount |
|---|---|---|
| 9/13/07 | (Blank) | 2,925.00 |
| 10/5/07 | Gas | 4,770.40 |
| 10/9/07 | Serv Counter—Inv 56413 | 102.83 |
| 10/2/07 | (Blank) | 1,700.00 |
| 11/3/07 | Loan | 200.00 |
| 11/3/07 | Loan for Maine | 1,500.00 |
| 11/3/07 | Loan | 1,000.00 |
| 11/7/07 | Gas | 5,340.20 |
| 1/24/07 | Gas | 327.40 |
| 1/24/07 | Loan | 300.00 |
| 12/7/07 | Borrowed 100 and 300 | 400.00 |
| 12/7/07 | Washer Solvent | 17.88 |
| 12/7/07 | Gas | 363.80 |
| 12/7/07 | Peter owes Mike Surette (?) Payroll | 210.00 |
| 12/9/07 | Gas | 1,711.00 |
| 12/16/07 | Loan | 100.00 |
| 12/19/07 | Serv Counter—Inv 57121 | 283.24 |
| 12/22/07 | Loan | 200.00 |
| 12/27/07 | Loan | 2,000.00 |
| 1/4/08 | Gas | 8,981.01 |
| 1/12/08 | Woody's Tire on 12/21/07 | 370.00 |
| 1/12/08 | Repair Londonderry for Truck | 576.83 |
| 1/12/08 | Woody's Tire Bill | 705.00 |
| 1/12/08 | Granite State Dover | 508.00 |
| 2/4/08 | Gas | 4,338.00 |
| 8/28/08 | Serv Counter—Inv 59201 | 1,102.73 |
| 8/14/09 | Serv Counter—Inv 62362 | 2,232.38 |

| 11/25/09 | Serv Counter—Inv 13168 | 583.43 |
| 11/28/09 | Loan for Century Bank | 7,147.60 |
| 3/26/13 | Serv Counter—Inv 71882 | 530.98 |

8. The Hillside Statement identifies the account in question as "Peter Tufts/Tufts Trans. Inc."
   The address on the account is an address that is both the home address of the Debtor and
   the location from which he operated Transportation.  The Hillside Statement runs from
   January 1, 2005 to April 1, 2015 and includes an accounting of all alleged extensions of
   credit and payments during that period.  The Hillside Statement was generated in the
   ordinary course of Hillside's business.

9. Spinosa testified that "Tufts Trans. Inc." was added to the name of the account only to
   ensure that the Debtor's account did not get confused with other accounts, such as that of
   Tufts University.  He did not elaborate on how this would avert confusion, and this
   testimony is not credible. Spinosa used the account indiscriminately for all charges incurred
   by either the Debtor personally or Transportation.  Some charges on it were incurred by the
   Debtor personally, but most were incurred for and by Transportation.  The Hillside
   Statement does not indicate, as to any specific charge, whether it was incurred by the
   Debtor or by Transportation.

10. Hillside contends that the account was opened in the individual name of the Debtor and
    was always the responsibility of the Debtor individually. The Debtor disagrees, claiming that
    the gas, service, and other charges on the account were incurred by Transportation and
    were the responsibility of Transportation alone.  Hillside has adduced no evidence to
    support its position. There is no evidence of an agreement, written or oral, between the
    Debtor and Hillside under which the Debtor undertook responsibility for the charges listed
    on the Hillside Statement. From the entries on the Hillside Statement, it is clear that the vast
    majority of the entries, and an even vaster majority of the total charges on the account—
    most of which were for sales of gasoline in the thousands of dollars—were incurred for

commercial vehicles belonging to Transportation. Transportation was a for-profit corporation, not a dependent of the Debtor.  There would have been no reason—and no evidence was adduced of a reason—why, from the beginning of the account, Transportation should not have been understood by both parties as the obligor for the goods and services it obtained from Hillside.

11. Hillside also contends, in the alternative, that the Debtor is responsible for the whole of the account because he orally agreed to guarantee the obligations of Transportation. Spinosa testified and conceded that the Debtor had given Hillside no written guaranty, but he testified that the Debtor promised him, orally, that he would take care of the debt. Specifially, he testified that the Debtor told him,"don't worry about it, I'll take care of it," or words to that effect. It is this oral promise that Spinosa contends constitutes the guarantee. Spinosa did not indicate the setting in which the Debtor allegedly said these words: When did the Debtor say these words? What had prompted the Debtor to say them? What was the "it" that the Debtor allegedly said he would take care of? And in what capacity did he allegedly make this promise—individually, or in his capacity as principal of Transportation? Hillside has adduced no evidence of any of these things. Spinosa's evidence lacked the specificity and detail that I would expect on an issue of this import.

12. Spinosa never asked the Debtor for a guarantee.

13. Hillside has not alleged, and in any event no evidence has been adduced, that Hillside paid or promised consideration for the alleged guarantee.

14. Spinosa's allegation of a guarantee from the Debtor is inconsistent with his contention that the Debtor was, from the beginning, the primary obligor on the account.  One does not guarantee a debt on which he is the primary obligor.  A guarantor is by definition a secondary obligor, and Spinosa surely understood this. The inconsistency makes Spinosa not credible, either as to his alleged understanding that the Debtor was the primary obligor, or as to the allegation that the Debtor guraranteed Transportation's primary obligation.

5

15. Spinosa further testified that he would not have allowed Transportation to purchase gas or services without a personal guaranty. He testified: "I didn't give the Tufts Transportation credit. I gave Peter with his personal guaranty credit, knowing Tufts Transportation's financial situation, I would have never." I find this testimony not credible because, although the business relationship between Hillside and Transportation began in 2001, there is no evidence that Transportation's "financial situation" became an issue until late in 2007, when Transportation lost its major customer. I have no evidence that before that time Spinosa thought of Transportation as financially unreliable. In fact, the Hillside Statement itself, which captures all transactions between the parties from January, 2005, shows that until well into 2007, Transportation's payments kept pace with account charges.

16. The Debtor denies that he said the words that Spinosa attributes to him ("don't worry about it, I'll take care of it"). I find neither the Debtor nor Spinosa to be credible, but the burden here is on Hillside, and the evidence preponderates in favor of the Debtor's denial. Hillside has not carried its burden as to an oral guarantee.

17. Hillside contends that the charges that comprise its claim were incurred not by or for Transportation but by the Debtor individually, for his or his family's personal use. The burden is on Hillside to prove this as to each item in question. I find that he has carried that burden as to the following nine items, totaling $5,910.00, each of which is in the nature of a loan:

| Date | Description | Amount |
|------|-------------|--------|
| 11/3/07 | Loan | 200.00 |
| 11/3/07 | Loan for Maine | 1,500.00 |
| 11/3/07 | Loan | 1,000.00 |
| 1/24/07 | Loan | 300.00 |
| 12/7/07 | Borrowed 100 and 300 | 400.00 |
| 12/7/07 | Peter owes Mike Surette (?) Payroll | 210.00 |
| 12/16/07 | Loan | 100.00 |
| 12/22/07 | Loan | 200.00 |
| 12/27/07 | Loan | 2,000.00 |
| | **TOTAL** | $5,910.00 |

18.   The Debtor denies that he received loans from Hillside, but Spinosa testified that Hillside did make these advances to the Debtor, personally, as loans, and his testimony is corroborated by Hillside's contemporaneous accounting records, as reflected in and evidenced by the Hillside Statement. The loans began in late 2007, when Transportation lost its major client, which in turn caused the Debtor's stream of income from Transportation to dry up.   In view of the corroboration, I credit Spinosa's testimony here, and find that the nine items in issue were in fact loans.

19.   The Hillside Statement includes one other item that it calls a loan:  a charge dated November 28, 2009, in the amount of $7,147.60, labeled "Loan for Century Bank." This item arose only after the Debtor filed his bankruptcy petition.  When this was pointed out at the hearing, Hillside  withdrew this item from its proof of claim.  Accordingly, I need make no further findings as to this taspect of the Hillside claim.

20.   Hillside has further carried its burden as to one other charge, for service on August 14, 2009, in the amount of $2,232.38.  The evidence shows that this charge was for service to a vehicle, a 2003 GMC Yukon, that was driven by the Debtor's wife for personal and family use, not for the business of Transportation.

21.   As to none of the remaining charges that comprise the basis of its claim has Hillside established by a preponderance of the evidence that the charge is for service or fuel that the Debtor purchased for his or his family's use.  The largest of these items are for gas, each of which (even the smallest of these) is in an amount that cannot plausibly have been for use in a personal, non-commercial vehicle.  Spinosa testified that some of these charges may represent combined charges, several fill-ups combined into one entry.  This testimony is not credible, he adduced no documentation to support it, and it still is not plausible for the charges of $8,981.01, $5,340.20, $4,770.40, $1,711.00, and $4,338.00.

22.   The Hillside Statement does not provide any information about the vehicle or the driver that purchased the gasoline.  It was standard practice for the attendant to fill out a slip when an

individual or company purchased gasoline on credit.  The slip would include the name of the

company or person, the license plate of the vehicle, and the dollar value of gasoline

purchased.  The driver would then sign the slip and receive a copy.  The slips related to this

account were not presented in evidence; Spinosa claimed they were destroyed in a flood.

Be that as it may, there is no evidence linking the gasoline purchase entries on the Hillside

Statement to vehicles used by the Debtor personally or by his family.  And aside from the

one service charge for $2,232.38 addressed above, the same is true for the service charges

on the account.

23. Hillside's claim includes three charges that were incurred after the Debtor filed his

bankruptcy petition:  a charge of $583.43 incurred on November 25, 2009; a charge of

$7,140.88 incurred on November 26, 2009; and a charge of $580.98 incurred on March 6,

2013.

**Formation of InSite**

24. After Transportation stopped operating, Spinosa and the Debtor agreed to form Tufts

Incorporated, which later changed its name to InSite Contracting, Inc., and will be referred

to herein as InSite.

25. InSite was incorporated on January 15, 2008.  Spinosa was InSite's sole officer, director, and

shareholder.

26. Spinosa and the Debtor agreed that the Debtor would eventually become a fifty-percent

"partner" in the corporation, but no written agreement to that effect was ever made.

27. When InSite was formed, the Debtor sold equipment that had been used by Transportation

to InSite.  In exchange, the Debtor received checks from InSite for these sales.

28. From January 2008 to sometime in August 2009, the Debtor performed services for InSite as

an independent contractor and was paid for this work by checks from InSite's operating

account, not from its payroll account. As an independent contractor, the Debtor served as

InSite's operations manager, a role in which his duties included supervising work crews,

hiring and paying subcontractors and suppliers, preparing bids, operating equipment,

serving as a laborer, and finding new business for InSite. Later—precisely when is unclear—

the Debtor ceased to be an independent contractor and instead became an employee of

InSite; as an employee, he continued to serve as InSite's operations manager.

29. In his affidavit, the Debtor averred credibly that his compensation for his services to InSite

was to include $2,000.00 per week net, $100,000 per year in snow plowing revenues, and

full family medical insurance.

30. It was regular practice for InSite to pay some vendors in cash. Vendors would sometimes

give discounts if they were paid in cash.  To have cash to pay these vendors, checks would

be made out to the Debtor or "cash."  The Debtor would then cash the check and use the

cash to pay the vendor on behalf of InSite.  Though the check was made out to the Debtor,

he did not pocket the cash.  The Debtor explained this was part of his duties for InSite. His

testimony on this practice was corroborated by Julie E. DePiano, who was employed by

Insite in 2008 and 2009, did the bookkeeping, and was aware that Insite would make checks

payable to the Debtor with the understanding that the Debtor should negotiate the checks

at a check cashing service to then make payments to various vendors.

31. The relationship between the parties eventually soured, ending with Spinosa's firing the

Debtor in February 2013.

**InSite Proof of Claim**

32. Insite's proof of claim, No. 4-1, asserts a nonpriority unsecured claim in the amount of

$147,554.22 for "money loaned."  The proof of claim was prepared and filed for InSite by

Spinosa himself, acting without counsel.

33. Attached to the proof of claim is a six-page document entitled "Account Quick Report" (the

"Account Report"), which purports to list, in chronological order, "All Transactions" related

to "PT Loans" (PT here meaning Peter Tufts).  The Account Report was generated on

November 6, 2020.  According to Spinosa, it lists items that constitute loans from InSite to

Peter Tufts and credits against the amount due for those loans; Spinosa testified that the items listed through the date of the Debtor's bankruptcy filing constitute the basis for InSite's claim.

34. The earliest item on the report is dated January 1, 2008, and the latest March 1, 2013. InSite now concedes that only charges incurred prior to the Debtor's bankruptcy filing, on September 16, 2009, may constitute the basis for a claim in this case. After the last entry prior to the petition date, the Account Report shows a balance owing of $140,418.15, based on ninety-four separate loan items.

35. The Debtor denies that the items on the Account Report constitute loans to him. Rather, he contends, they are, variously, payments for his work for InSite as an independent contractor, payments for the equipment he sold to Insite, Insite business expenses that were paid in cash through him, and payments to third-party vendors and creditors of InSite. The Debtor points out, correctly, that the various transactions in issue are supported by no documentation other than the Account Report and (when the item is a payment made by check) the check itself, and the checks themselves do not indicate (such as by an indications on their memo lines) that the payments they effected were, in essence, loan advances to or for the benefit of the Debtor. The Debtor further points out, again correctly, that InSite has not produced, and there does not exist, any written loan agreement between himself and InSite, such as a promissory note or other memorandum of a loan arrangement. Insite, for its part, maintains that the various items were in fact loans and that no documentation was executed due to the friendship between the Debtor and Spinosa.

36. As the Debtor contends and InSite does not dispute, there is no documentation whatsoever for any of the alleged loans in issue, no indication in writing in which the Debtor agrees to a loan or that certain advances were loans to him, much less a statement of terms. In the relevant period—from the formation of InSite to the Debtor's bankruptcy filing—there were nearly one hundred items, and some of these are composites. I find it unlikely that, even

10

between friends, loans of this number and total amount would not ever be reduced to writing. This is especially true where InSite had newly been formed, the Debtor had been promised an equity interest in it, the Debtor was working for it and being paid as an independent contractor, and in that capacity making payments from InSite to third parties. The absence of any memorandum of these loans is cause to find that the various items in issue were not made in consideration of a promise by the Debtor to repay.

37. The first two items on the Account Report, for $8,050.00 and $8,085.31, are dated January 1, 2008, two weeks prior to the formation of InSite. As to each, the Account Report bears a notation indicating that it is an "old balance." Spinosa testified at deposition that these items represented debt of the Debtor to Spinosa himself that had accrued before the formation of InSite, and that he (Spinosa) added them to the Debtor's InSite account for "tracking" purposes. On the basis of this testimony, I find that these loan debts—if they are loan debts at all (about which I make no finding)—are not debts to InSite.

38. The Account Report includes an item, a "bill," dated December 31, 2008, in the amount of $24,000; the name on this entry is Hillside, and the accompanying note says simply "Tufts Transport Fuel." InSite adduced no bill in support of this item. In his affidavit, Spinosa averred that this was a payment—actually a series of fifteen payments, from February through July 2009, totaling $24,000, lumped together in a single entry on the Account Report—to Hillside in satisfaction of amounts owed to Hillside for gasoline supplied to Transportation. I have found above that the Debtor was not obligated to Hillside for sale of gasoline by Hillside to and for the benefit of Transportation. These payments therefore abated no obligation of the Debtor to Hillside. Spinosa does not contend that the Debtor agreed to treat these payments as loans to himself from InSite, and I find that the Debtor never so agreed. I find no legitimate basis to treat these payments as loan advances to the Debtor or as obligations the Debtor is bound to repay to InSite.

11

39. The Account Report includes another item, also a "bill" and dated December 31, 2008, in the amount of $31,349.25; the name on this entry is Hillside, and the accompanying note says "2008 loans." With respect to this item, Spinosa explained in his affidavit that Hillside had loaned significant funds to the Debtor and was beginning to experience cash flow issues. "When [InSite] had income coming in, I decided, with [the Debtor] being aware of this decision, to transfer funds to [Hillside] . . . for some of the funds that had been loaned to [the Debtor.]" I have no evidence to corroborate that the Debtor was aware of this decision and find that he was not aware of it. In any event, Spinosa does not contend that the Debtor agreed to treat these payments as loans to himself from InSite, and I find that the Debtor never so agreed. In addition, there is a gross disparity between the extent of the loans that InSite is here contending that Hillside made to the Debtor in 2008, some $31,349.25, and those that Hillside itself accounted for in the Hillside Statement, just $5,910.00. The latter renders the former not credible. In addition, by its filing a claim in this case for (among other things) this $5,910.00 in loans it made to the Debtor in 2008, Hillside essentially affirmed that this amount remained owing *to Hillside* when it filed its proof of claim (or at least on the petition date). It follows that these items had not been paid by InSite On the strength of that averment, I disbelieve Spinosa's testimony that he caused InSite to make the $31,349.25 payment that forms the basis of this item.

40. On the basis of the findings in the previous three paragraphs, I find (i) that the accounting presented in the Account Report is fundamentally unreliable and (ii) the fact that an item appears on this document is no indication that in fact the item constituted an amount advanced to or on behalf of the Debtor as a loan from InSite, or that is was contemporaneously recorded as such in the ordinary course of InSite's business.

41. Spinosa conceded at trial that because of the judgment against him and in favor of the Debtor in the Superior Court, he wanted some of the money he paid to the Debtor to be repaid through the claims process in this case. The gist of this testimony was not simply that

he was hoping to recover on his claim, but that his purpose here was revenge for his loss in

the Superior Court. The normally legitimate and unremarkable desire to be paid on one's

claims has in Spinosa's case become inordinate, causing him even to include in InSite's claim

items he knew were not obligations of the Debtor to InSite.  I have found his testimony in

general to be less than credible.

42.  Eighteen items on the Account Report are checks made out by InSite to the Debtor himself.

43.  The first check to the Debtor, for $5,800.00, is dated January 9, 2008, which date precedes

the incorporation of InSite.  Therefore, if it represents a loan at all, it cannot be one by

InSite.

44.  The remaining seventeen checks total $23,740. As to fourteen of these, the Account Report

supplies no note or description and no indication of what this payment might be. As to the

remaining three, the notes are unhelpful:  the first says "2008LCAJE01"; the second,

"dragone"; and the third, "build out stone/sand retaining walls."  As to all except one,

Spinosa averred in his affidavit that it was "for personal loan requested by [the Debtor] for

living and/or debt due to others."  The last was "for personal loan requested by [the Debtor]

debt due to others for repairs to the Freightliner tractor owned by Tufts Services, Inc."  In no

instance does Spinosa indicate how he knows the purpose, that it was a loan and not

(among other things it might have been) payment for the Debtor's services to InSite.  In no

instance does there exist a writing by the Debtor indicating that the item is a loan or

requesting the loan. For these reasons, I find that InSite has not sustained its burden of

showing that the seventeen checks are loan advances.

45.  Eleven items on the Account Report, totaling $10,975.45, are for checks from Insite to

Century Bank, each of which Spinosa contends was a payment made for the benefit of the

Debtor on a debt owed by the Debtor's in-laws to Century Bank.  At trial, the Debtor

adduced evidence, a UCC-1 filed by Century Bank, showing that InSite was indebted to

Century Bank during this period on an equipment loan.  InSite adduced no evidence that the

13

payment was on other debt to Century Bank.  I find that Insite has failed to establish that

this payment was for the benefit of the Debtor, much less that it was a loan.

46. The above findings dispose of 33 items and $109,700.01 of the amount claimed.  I need not

belabor the numerous smaller items in issue.  As to none of these does there exist a writing

by the Debtor evidencing a loan or a promise to repay an advance.  Nor does such other

evidence as InSite has adduced—mostly just the Account Report and Spinosa's testimony—

preponderate in favor of a finding that any of these items is a loan.

**Previous Litigation**

47. In 2013, Spinosa commenced an action in Massachusetts Superior Court ("Superior Court

Action") against the Debtor, seeking a harassment prevention order.  The suit did not

contain a request for damages.

48. The Debtor filed counterclaims against Spinosa for breach of their partnership agreement,

misrepresentations that induced him into the agreement, and failure to pay prevailing

wages under the relevant state statute.

49. The Debtor also filed a third-party complaint against InSite.  InSite did not counterclaim

against the Debtor for the charges that form the basis of its claim in this case.  By the time

of this state court action, the Debtor had received a discharge in bankruptcy, and InSite's

prosecution of its claims in that action would have violated his discharge.

50. In the state court action, the parties agreed to waive detailed written findings of fact and

rulings of law in favor of special questions to be submitted to the judge.  A trial was held in

July of 2017.  The Debtor estimated that Insite was worth $3 million, even accepting

Spinosa's claim that the company was $1.4 million in debt.  The valuation did not include

assigning a value to equipment that was encumbered.

51. The judge found in favor of the Debtor and awarded damages of $1.2 million for breach of

contract, $134,000 for misrepresentation, and $135,213 on the claim for prevailing wages.

Spinosa appealed the decision.

52. The first special question, which the trial judge answered in the affirmative, was, "Did Peter M. Tufts sustain his burden of proving, by a fair preponderance of the credible evidence, that Defendants-in-Counterclaim materially breached the Partnership Contract with Peter M. Tufts?"

53. The second special question, also answered in the affirmative, was, "Did Peter M. Tufts sustain his burden of proving, by a fair preponderance of the credible evidence, that he was caused to sustain damages as a result of Defendant's in Counterclaim breach of the Partnership Contract?"

54. The last relevant question was what the damages should be for the breach contract.  The trial judge answered $1,200,000.00.

55. The Massachusetts Appeals Court affirmed the trial court decision except as to the award of damages for misrepresentation; as to this latter count, the Appeals Court determined that the damages awarded were duplicative of the breach of contract damages.

56. The Superior Court's valuation of the partnership was one issue raised on appeal.  Spinosa argued on appeal that the Superior Court should not have relied on the Debtor's testimony as to value because the Debtor was not sufficiently familiar with the company's financial affairs.  The Appeals Court rejected this argument.

57. Spinosa also argued that the award should be vacated because of evidence that the company was not profitable.  The Appeals Court also rejected this argument, pointing out that the trial judge had stated, "Tufts gave a value of the partnership, and the other parties gave a value of their partnership and the [c]ourt found one more credible than the other."

58. After learning of the judgment in favor of the Debtor, the United States Trustee moved to reopen the bankruptcy case, arguing that the judgment, and the causes of action it liquidated, were property of the estate.  The Court allowed the motion, and the bankruptcy case was reopened in August of 2020 for administration of the newly-discovered asset.

59. As previously found, in November of 2020, Spinosa, without counsel, filed proofs of claim on

behalf of each of  Hillside and Insite.  The obligations he asserted in and as the basis of

InSite's proof of claim were never asserted in the Superior Court Action, either by Insite as

counterclaims against the Debtor, or by Spinosa as a setoff against the recoverable value of

the Debtor's interest in InSite.

60. In December of 2020, Spinosa filed a malpractice lawsuit against the attorney that

represented him in the Superior Court Action.  The suit alleges that the attorney was liable

for negligence, breach of contract, and violation of the state consumer protection statute,

Chapter 93A.  Spinosa's complaint in that action alleged that the attorney was negligent in

failing to hire an expert to value the company and in agreeing to a mid-trial stipulation of

liability without Spinosa's authority.

61. Spinosa was aware of this debt at the time of the Superior Court Action. He alleges that he

brought the debt to the attention of his attorney, but it did not mature into a claim in that

case.  This is one of the claims in the malpractice litigation.

**LEGAL STANDARD**

A properly executed and filed proof of claim constitutes prima facie evidence of the validity

and amount of the claim. Fed. R. Bankr. P. 3001(f).  A claim is executed and filed properly if it

satisfies the two requirements set forth in Rule 3001 of the Federal Rules of Bankruptcy Procedure.

First, if a claim is based on a writing, either the original or a duplicate should be filed with the proof

of claim, Fed. R. Bankr. P. 3001(c)(1); and second, if the claim asserts a security interest in property,

the claim shall be accompanied by evidence that the security interest has been perfected.  Fed. R.

Bankr. P. 3001(d). If the proof of claim is not filed in accordance with the rules, then it is not entitled

to prima facie evidence. *In re Long*, 353 B.R. 1, 13 (Bankr. D. Mass. 2006).  Judge Somma summarized

the burdens with respect to proofs of claim:

> In order to rebut [the] prima facie evidence, the objecting party must produce
> "substantial evidence" *United States v. Clifford (In re Clifford)*, 255 B.R. 258, 262 (D.
> Mass. 2000); *Hemingway Transport*, 993 F.2d at 925. If the objecting party produces

> substantial evidence in opposition to the proof of claim and thereby rebuts the
> prima facie evidence, the burden shifts to the claimant to establish the validity of its
> claim. *Hemingway Transport*, 993 F.2d at 925 ("Once the trustee manages the initial
> burden of producing substantial evidence. . .the ultimate risk of nonpersuasion as to
> the allowability of the claim resides with the party asserting the claim.").

*Id.* The "substantial evidence" that the objecting party must produce in order to rebut the claim's

prima facia validity is "evidence which, if believed, would refute at least one of the allegations that is

essential to the claim's legal sufficiency." *In re Everett*, 2013 WL 3757283, at *5 (Bankr. D. Mass. July

15, 2013); *In re Alleghany International, Inc.*, 954 F.2d 167, 173- 174 (3d Cir. 1991). This means that

an "'objector must produce evidence equal in force to the prima facie case.'" *Tracey v. United States*

*(In re Tracey)*, 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at

173).

      Prior to the evidentiary hearing, this Court found that the Debtor, based on his direct

testimony via affidavit, had met his burden of producing substantial evidence to rebut the

presumption of prima facie evidence of both claims; thus the burden shifted to the claimants, InSite

and Hillside. As to each basis of objection, the claimant's burden of establishing the validity of its

claim is not one of starting from scratch. Rather, in view of the prima facie validity of the claim, the

claimant's burden of ultimate persuasion (answering an objection supported by sufficient evidence)

is a burden of persuasion only as to the particular objection, of establishing that the defect alleged in

the objection either does not exist or is no defect.

**HILLSIDE PROOF OF CLAIM (CLAIM NO. 3)**

      The Debtor objects to Hillside's proof of claim on five grounds, requesting in sum that the

claim be disallowed in its entirety.

    **a.  Res Judicata, Abandonment, or Waiver**

      First, in his proposed findings of fact and conclusions of law, the Debtor argues that charges

constituting this claim should be disallowed "as a matter of res judicata, abandonment, or waiver

because all of these alleged debts existed at the time of the 2013 Massachusetts Superior Court

litigation between Frank Spinosa and [the Debtor] . . . and Spinosa failed to raise those alleged debts

in mitigation or set-off against Peter Tufts counter-claims (sic) in that previous litigation." I find no

merit in this argument for the following reasons.  First, the Debtor failed to raise this basis of

objection in his original objection and cannot raise it for the first time in his proposed findings of fact

and conclusions of law, which effectively would deprive the Debtor of notice and an opportunity to

be heard on this basis of objection. Second, by the time of the 2013 litigation, the Debtor had

received a discharge in this chapter 7 case, which discharge enjoined the prosecution of this claim

(the part of it that arose before the bankruptcy filing) against him *in personam*.  There can be no res

judicata, abandonment, or waiver as to a claim that a party was enjoined from prosecuting. Third, no

privity exists between Hillside and the parties to the Superior Court judgment, and therefore that

judgment cannot be claim preclusive here.  Hillside was not a party to that litigation.  *See Grella v.*

*Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994) ("an identity of parties or privies in the two

suits" is an essential element of claim preclusion).

### b.  Post-Petition Charges

As his second ground, the Debtor points out that the Hillside Account includes three

obligations that arose after the Debtor filed his bankruptcy petition, and he argues that, as post-

petition obligations, these charges cannot be allowed as claims against the bankruptcy estate. See

11 U.S.C. § 502(b) (requiring determination of the amount of a claim "as of the date of the filing of

the petition").  At trial Hillside conceded that the post-petition charges cannot be collected from the

Debtor's estate and agreed to waive them.  Accordingly, the three items in question—a charge of

$583.43 on November 25, 2009, another of $7,140.88 on November 26, 2009, and a third of $580.98

on March 6, 2013—totaling $8,305.29, are deemed waived and shall be disallowed.

### c.  Debtor as Primary Obligor for Obligations of Transportation

Hillside, through its principal Spinosa, contends that, from the start of its relationship with

the Debtor, it was understood between them that the Debtor would be responsible for all charges

on the account that Spinosa maintained in the names of the Debtor and Transportation, which

account was used, for the most part, for the fueling and servicing of Transportation-owned

equipment vehicles.  The Debtor denies this he agreed to be the obligtor. I have found that the

evidence does not establish that the Debtor contractually assumed responsibility for this account.

Accordingly, I find no basis to hold the Debtor responsible as primary obligor for those charges on

this account that were incurred by and for the benefit of Transportation.

### d.   Debtor as Guarantor of Obligations of Transportation

In the alternative, Hillside argues that the Debtor is liable for the account balance because

he orally guaranteed the extensions of credit Hillside made to Transportation. The Debtor denies

that he orally guaranteed Transportation's debt, and he further argues that, under the

Massachusetts Statute of Frauds, a guarantee not in writing is unenforceable. Hillside does not

contend that it ever received a guarantee in writing, but it argues that the oral guarantee given in

this instance is enforceable because it qualifies under the leading object exception to the statute of

frauds.[1]

I need not determine whether the leading object exception applies. A necessary predicate to

the exception is evidence that the alleged guarantor, the Debtor here, made a promise to pay the

debts of the third party, Transportation.  Hillside has not met its burden of proving that the Debtor

---

[1] The Massachusetts Statute of Frauds requires a guarantee to be in writing.

> No action shall be brought: . . . Second, to charge a person upon a special promise to answer
> for the debt, default, or misdoings of another; . . . unless the promise, contract, or
> agreement upon which such action is brought, or some memorandum or note thereof, is in
> writing and signed by the party to be charged therewith.

MASS. GEN. LAWS ch. 259, § 1.  Hillside urges that the Statute of Frauds is subject to the so-called "leading object
exception," which Hillside argues applies on the facts of this case.  The leading object exception discerns
whether the guarantor's purpose or object in making the promise to guarantee is to obtain a benefit for itself
or to provide a benefit for a third person, the codebtor. The exception is described in the Restatement Second,
Contracts § 116, which has been applied in Massachusetts.

> A case is not within the statute, where, upon the whole transaction, the fair inference is, that
> the leading object or purpose and the effect of the transaction was the purchase or
> acquisition by the promisor from the promisee of some property, lien or benefit which he did
> not before possess, but which enured to him by reason of his promise, so that the debt for
> which he is liable may fairly be deemed to be a debt of his own, contracted in such purchase
> or acquisition.

*Central Ceilings, Inc. v. National Amusements, Inc.*, 873 N.E.2d 754, 760 (Mass. App. Ct. 2007) (citing *Nelson v.
Boynton,* 44 Mass. 396, 400 (1841)); *see also In re Rolfe*, 25 B.R. 89, 93-94 (Bankr. D. Mass. 1982).

made an oral guarantee.  "A guaranty is a contract like all other contracts." *Federal Financial Co. v. Savage*, 730 N.E.2d 853, 856 (Mass. 2000).  Accordingly, I turn to the conventional elements required to prove the existence of a verbal contract, noting that the burden is on Hillside. *See Canney v. New England Tel. & Tel. Co.*, 228 N.E.2d 723, 727 (Mass. 1967) ("Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made.") (citing *Breed v. Berenson*, 103 N.E. 937, 939 (Mass. 1914)).  I have already found that Hillside has failed to prove by a preponderance of the evidence either that the Debtor made the promise that constitutes the alleged guarantee or that consideration was promised or given in exchange.  In addition, the alleged guarantee is hopelessly vague as to the debt it applies to; even if I were to find that the Debtor made the promise alleged, I would be unable to determine what precisely he had promised to pay. Whether an individual made an oral guarantee is a question of fact, and Hillside has not proven that guarantee. *Berkshire-Westwood Graphics Group, Inc. v. Davidson*, 73 Mass. App. Ct. 1128, at *2 (2009); *see also Bresky v. Rosenberg*, 152 N.E. 347, 351 (Mass. 1926) ("[o]rdinarily the question whether a contract has been made is one of fact.").

### e.   Were the Charges Incurred by the Debtor?

Having failed to establish that the Debtor is responsible for the account *in toto*, either as the primary obligor for the charges incurred by Transportation or as a guarantor for those charges, Hillside argues that the Debtor is liable for each of the charges in issue because each was incurred not by Transportation but by and for the benefit of the Debtor himself or his family.

Hillside's proof of claim is prima facie evidence of the amounts due from the Debtor, but the Debtor has produced substantial evidence in response to the claim, which effectively shifts the burden of proof entirely to Hillside. As to ten of the charges in issue—nine loans totalling $5,910.00 and one charge for service in the amount of $2,232.38—I have found that Hillside has carried its burden of proving that the charge was incurred by the Debtor for the benefit of himself or his family, and not by and for the benefit of Transportation.  These items together total $8,142.38. As to the remaining charges in issue, I have found that Hillside has failed to carry this burden.

Accordingly, a separate order will enter allowing Hillside's claim in the amount of $8,142.38

as a nonpriority unsecured claim and sustaining the Debtor's objection as to the balance of the

claim.

**INSITE PROOF OF CLAIM (CLAIM NO. 4)**

The Debtor objects to InSite's claim on three grounds.

**a.   Failure to Attach Requisite Writing to Proof of Claim**

The Debtor first argues that InSite's claim may be disallowed because the Account Report

that is attached to the proof of claim does not support the claim, and failure to attach to the claim a

writing on which the claim is based is grounds by itself to disallow the claim.  The argument is

confused and overambitious.  The argument is based on Rules 3001(c)(1) and (f).  The former states:

"when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim."

Fed. R. Bankr. P. 3001(c)(1). The latter states:  "A proof of claim executed and filed in accordance

with these rules shall constitute prima facie evidence of the validity and amount of the claim."  Fed.

R. Bankr. P. 3001(f).  It is enough to note that InSite's claim is not based on a writing.  Accordingly,

InSite was not required to attach a writing to the proof of claim, and the fact that the Account

Report that was attached to the proof of claim may not itself support the claim is of no

consequence.  Upon its filing, the proof of claim had prima facie validity. [2]

**b.   Waiver, Laches, Judicial Estoppel, Issue Preclusion, and Claim Preclusion**

Second, the Debtor objects to InSite's claim on the basis that it is precluded by the doctrines

of waiver, laches, judicial estoppel, issue preclusion, and claim preclusion.  In his proposed findings

and conclusions, the Debtor makes no mention of waiver, judicial estoppel, or laches; accordingly, I

deem these defenses waived.

---

[2] If a writing were required, the failure to attach that writing to the proof of claim would merely deprive the claim of its prima facie validity, *Falwell v. Roundup Funding, LLC (In re Falwell)*, 434 B.R. 779, 783 (Bankr. W.D.Va. 2009), not foreclose the claimant's opportunity to prove its claim.

The Debtor argues that InSite's claim is barred by res judicata because its claims for the alleged loan debt of the Debtor could have been, but were not, raised in the Superior Court Action between the Debtor and InSite. The argument gains no traction because, by the time of the commencement of the Superior Court Action, the Debtor had received in this bankruptcy case a discharge under 11 U.S.C. § 727.  Subject to exceptions not applicable here, a discharge under that section discharges the debtor from all debts that arose before the date of the order for relief, in this instance (as in most) on the petition date.  11 U.S.C. §§ 727(b) and 301(b).  The discharge operates as an injunction against the commencement of an action to collect, recover, or offset any debt discharged under § 727.  11 U.S.C. § 524(a)(2).  InSite was thus enjoined from commencing an action, such as by filing a counterclaim against the Debtor, for enforcement of the debt at issue here. The claims at issue therefore could not have been raised in the State Court Action, and the factual predicate of this argument for res judicata fails.

Next the Debtor argues that issue preclusion bars the relitigation of the existence and amount of liability for the claims at issue here.  He reasons that in the claim by the Debtor against Spinosa for breach of the partnership agreement, one issue was damages, which were dependent on the value of the company, InSite, which was in turn dependent, at least in part, on the value of InSite's claims against the Debtor, because those claims are assets of InSite.

Issue preclusion, also known as collateral estoppel, bars the relitigation of issues fully litigated and determined in a prior action between the parties.  *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997).  Federal courts must apply the collateral estoppel law of the state that issued the judgment.  *Id*. at 50-51.  In Massachusetts, for collateral estoppel to apply, the following elements must be met:

> (1) The issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding judgment; and (4) the determination of the issue must have been essential to the judgment.

*Id.* Issue preclusion being in this instance an affirmative defense, the party invoking collateral estoppel bears the burden of proof. *Id.* at 51.

The case for issue preclusion fails in at least two respects. First, the issue decided in that action is not identical to the issue presented here. In the State Court Action, the court and parties would have been bound to value InSite's claims against the Debtor in light of the discharge, which rendered those claims uncollectable. For purposes of the present action, where the claim is asserted against the Debtor's bankruptcy estate, the discharge does not apply and is irrelevant. In view of that crucial difference, the issue decided earlier is not the same as the issue presented in this proceeding.

Second, the Debtor has failed to establish the value that the state court attributed to Insite's claims against him. In the Superior Court Action, the parties opted for the judge to answer special questions and findings. This effected a waiver of written judicial findings with the level of detail required by Mass. R. Civ. P. 52(a). Mass. Super. Ct. R. 20(2)(h). Consequently, the Superior Court judge entered only a conclusory answer to the question of what the damages should be. This answer was presumably based on the valuation of the business, but, even if that presumption can be indulged for present purposes, we have no indication of the value given to InSite's accounts receivable, and in particular to those due from the Debtor, in that overall valuation. Without proof of a specific determination of the value of the receivables from the Debtor—which would itself not necessarily be identical to a determination of the validity and amount of those claims—we have nothing to give preclusive effect.

The Debtor contends that, by its recitation of facts, the Massachusetts Appeals Court decision (the "Appeal Decision") remedied this deficiency. It did not. Citing to Massachusetts Superior Court Rule 20, the Appeals Court stated, "[w]e recite the facts that the judge *could have found*." *Spinosa, et al v. Tufts*, 351 N.E.3d 892, 896 (Mass. App. Ct. 2020) (emphasis added). The Appeals Court did not itself find facts and could not divine what the trial judge actually found on this

subsidiary issue.  I am not able to determine from the evidence what facts were found.  Accordingly, I find no merit in the Debtor's affirmative defense of issue preclusion.

### c.   Whether the Various Items were Loans

The third basis on which the Debtor objects is that the items listed in the Account Report are not loan advances to the Debtor, and, to the extent that they represent payments made by InSite at all, there is no basis in fact for concluding that they were made in exchange for a promise by the Debtor to repay them. InSite replies that the Account Report was kept accurately and reflects loans to the Debtor and payments on behalf of the Debtor.

This is a classic example of why friends entering into business together should not forgo the traditional formalities:  *written* employment contracts, partnership agreements, loan agreements. The claim presents a factual dispute that, for the most part, boils down to one person's word against another's. In these circumstances, burdens of proof often prove dispositive. The Debtor bore the initial burden of putting forth substantial evidence through his testimony, the testimony of third parties, and documents.  He satisfied that burden and thereby overcame the prima facie validity of the claim. This shifted the ultimate burden of proof to InSite. I have found that, as to each of the items in issue, InSite has failed to carry its burden of proving that the advance in question was made under an agreement by the Debtor to repay.  Accordingly, the Court will by separate order sustain the Debtor's objection to InSite's claim and disallow the claim in its entirety.

Date:  May 31, 2022

_____
Frank J. Bailey
United States Bankruptcy Judge